# GERMAN NATIONAL BANK

*v.*

## ROBERT MEADOWCROFT.

*Filed at Ottawa May 18, 1880.*

1. TROVER—*when it will lie—commingling of property.* It is not essential to the maintenance of an action of trover that the property in respect of which a recovery is sought shall be capable of identification, and distinguished or separated from all other property of like character. Nor does it matter whether the plaintiff held the property alleged to have been converted, in severalty, or in common with another,—his right of recovery is the same in either case, the measure of his recovery being controlled, of course, by the extent of his interest in the property.

2. SAME—*as to grain stored in public warehouse, and mingled with other grain.* So, where grain is consigned to a public warehouse, and is there stored in bins, mingled with other grain of like character and grade, belonging to different persons, so that its identity is lost, upon the refusal of the warehouseman to deliver, upon the presentation of the proper warehouse receipts, the quantity of grain, and of the grade, called for by such receipts, the holder of the receipts may maintain trover for the recovery of damages according to the extent of his interest in the property thus converted.

3. And this right of action would exist, whether the plaintiff be regarded as the owner in severalty of the number of bushels of grain represented by his warehouse receipts, or whether it is to be considered that he holds a certain proportionate interest in all the grain in store in common with other holders of receipts.

4. SAME—*against whom the action will lie—transfer of public warehouse.* If the ownership and possession of a public warehouse or elevator shall be transferred to another by the person to whom grain has been delivered for storage therein, the person so succeeding to the possession of the warehouse and of the grain in store therein will be held to the same liability to the holders of

warehouse receipts, and subject to the same remedies, as the former proprietor who received the grain and issued the receipts.

5.  In this case the owner of a public warehouse, in which was stored large quantities of grain owned by different persons, conveyed the warehouse property in trust for the security of a creditor.  The creditor took possession of the warehouse, and of the grain stored therein, placing the property in charge of another person as his agent.  The holder of a warehouse receipt for a quantity of grain delivered to the former owner of the warehouse, presented the same to the person thus in charge, and demanded the grain represented thereby, which was refused:  *Held,* an action of trover would lie against the creditor so in possession, at the suit of the holder of the warehouse receipt, for the conversion of the grain called for by the receipt.

6.  SAME—*as to liability of a corporation—ultra vires.*  Where a National bank takes possession of a public warehouse conveyed to it by the owner by deed of trust to secure a debt due to the bank, the warehouse at the time of such change of possession containing grain in store for which warehouse receipts had been issued, the bank can not escape the duty and liability to deliver the grain represented by such receipts upon a proper presentation of the same and a demand of the grain, merely because the conducting of a warehouse business is not within the scope of its corporate powers.  If the bank should refuse to deliver the grain under such circumstances, it would be guilty of a conversion of the property, and liable to an action therefor, regardless of the character of its chartered authority.

APPEAL from the Appellate Court for the First District.

Messrs. TENNEY & FLOWERS, for the appellant:

The important questions presented by the record in this case are:

*First.*  Can a corporation be held responsible for a tortious act committed by its agent in relation to a matter entirely beyond and without the scope of the purposes for which it was incorporated?

*Second.*  Can trover be maintained for the conversion of grain which, by the consent of its owner, has been mixed with other grain of like character, so as to have lost its identity?

1.   Corporations can exercise only such powers as are expressly conferred on them, and such implied powers as are necessary to enable them to perform their prescribed duties. *Vandall* v. *San Francisco Dock Co.* 40 Cal. 83; *Bellmeyer* v.

*Ind. Dist. of Marshalltown,* 44 Iowa, 564; *Weckler v. First National Bank,* 42 Md. 581; *St. Louis v. Weber,* 44 Mo. 547; *Matthews v. Skinner,* 62 id. 329.

Corporations are not responsible for the unauthorized and unlawful acts even of their officers, although done *colore officii.* To fix the liability, it must either appear that the officers were authorized to do the act, or that it was done *bona fide* in pursuance of a general authority in relation to the subject of it, or that the act was adopted or ratified by the corporation; but if the tortious act arises in a matter which is foreign to the objects and purposes of the corporation, and beyond its powers, express or implied, it can not be held liable. Angell & Ames on Corp. sec. 311, n. 4; 2 Dillon on Mun. Corp. 877; *City of Chicago v. Turner,* 80 Ill. 419; *Board of Trustees v. Schroeder,* 58 id. 353; *Howe v. Mayor, etc. of Baltimore,* 30 Md. 218; *Eastman v. Meredith,* 36 N. H. 278; *Mayor, etc. v. Cunliff,* 2 Com. 165; *Weckler v. First National Bank,* 42 Md. 581; *First National Bank of Manhattan v. Citizens' Bank of Topeka,* (U. S. Cir. C.) 21 Int. Rev. R. 382; *Indianapolis, etc. Ry. Co. v. Anthony,* 43 Ind. 183; *Brokaw v. N. J. R. R. etc. Co.* 32 N. J. L. 328; *Wiley v. First National Bank of Brattleboro,* 44 Vt. 546; *Hood v. N. Y. and N. H. R. R. Co.* 22 Conn. 1 and 502; *First National Bank of Lyons v. Ocean National Bank,* 60 N. Y. 278; *Scott v. National Bank of Chester Valley,* 72 Pa. St. 471; *De Haven v. Kensington National Bank,* 81 id. 95; *Vanderbilt v. Richmond Turnpike Co.* 2 Conn. 479; *Sturges et al. v. Keith,* 57 Ill. 451.

2. Will trover lie? That replevin will not lie for grain so intermixed, has long since been decided by this court. *Low v. Martin,* 18 Ill. 286.

It has also been decided by this court that where grain has been received into a warehouse and placed in a common bin, and mixed with the grain of other persons, and lost its identity, the owner has parted with his property in it, and that the receipt issued to him does not represent his grain. *Bailey*

v. *Bensley et al.* 87 Ill. 556; *Seymour* v. *Wyckoff*, 10 N. Y. 213; *Chase* v. *Washburn*, 1 Ohio St. 244; *Norton* v. *Woodruff*, 2 Com. 153; *Hurd* v. *West*, 7 Cow. 752; *Ewing* v. *French*, 1 Blackf. 353; *Smith* v. *Clark*, 21 Wend. 83; *Buffum* v. *Merry*, 3 Mason, 478; *Lonergan* v. *Stewart*, 55 Ill. 44; *Rahilly* v. *Wilson*, 3 Dill. 420; *Johnson* v. *Brown*, 37 Iowa, 200; *Dillingham* v. *Smith*, 30 Me. 370; *Loomis* v. *Green*, 7 Greenl. 386; *Lupton* v. *White*, 15 Ves. 432; *Scudder* v. *Wooster*, 11 Cush. 573; *Hutchinson* v. *Hunter*, 7 Barr, 140; *Golder* v. *Ogden*, 15 Pa. St. 528; *Waldo* v. *Belcher*, 11 Ind. 609; *Merrill* v. *Hunnewell*, 13 Pick. 213; *Young* v. *Austin*, 6 id. 279.

Messrs. BARKER, BUEL & BARKER, for the appellee:

A corporation may be held responsible for a tortious act committed by its agent in relation to a matter entirely beyond and without the scope of the purposes for which it was incorporated.    *St. Louis, Alton and Chicago Railroad Co.* v. *Dalby*, 19 Ill. 353; *Wolf* v. *Boetcher*, 64 id. 316; Angell & Ames on Corp. p. 310, 311, 385; Hilliard on Torts, vol. 2, p. 322.

In support of the doctrine that trover will lie for the conversion of grain which, with the consent of the owner, has been mixed with other grain of like character, so as to have lost its identity, counsel cited *Broadwell* v. *Howard et al.* 77 Ill. 305; *Cool et al.* v. *Phillips et al.* 66 id. 216; *Young* v. *Mills*, 20 Wis. 615; *Kimberly* v. *Patchin*, 19 N. Y. 330; 1 Chit. Pl. 146, 148, 161; *Jackson* v. *Anderson*, 4 Taunt. 24; *Leonard* v. *Dunton*, 51 Ill. 482; *Whitehouse* v. *Frost*, 12 East, 614; *Gardner* v. *Dutch*, 9 Mass. 427; *Woodley* v. *Coventry*, 2 H. & C. 164; *Benjamin* v. *Stremple*, 13 Ill. 466; *Boyle* v. *Levings*, 28 id. 314; *Walsh* v. *Adams*, 3 Denio, 125; *Nowlin* v. *Colt*, 6 Hill, 461; *White* v. *Morton*, 22 Vt. 15; Rev. Stat. ch. 76, § 2.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

It appears from the transcript in this case that one Runyan, about the 10th day of July, 1876, being indebted to the Ger-

man National Bank of Chicago, conveyed to Herman Schaffner, its cashier, in trust for the bank, a public warehouse for grain in the city, known as "Runyan's Elevator;" that afterwards, about the 1st day of November of that year, the bank, through its agents, took possession of the warehouse, in which there was at that time 18,000 or 20,000 bushels of barley stored for different persons. Appellee held warehouse receipts for a trifle over 6000 bushels of this grain, which had been issued for grain actually stored therein.

These receipts contained an agreement by the owner that the grain therein mentioned might be stored with other grain of the same grade or quality, by inspection. It is conceded that this grain was thus stored. And it is found by the Appellate Court that at the time the bank took possession there was a sufficient quantity of grain in the warehouse to meet all the outstanding receipts. The bank, when it took possession, placed one Stokes in charge, and he at once began to receive grain, and placed the same in bins with other grain in store and issued warehouse receipts, and he delivered grain therefrom.

In the following December appellee tendered to Stokes the warehouse charges due for storage and demanded of him the barley represented by his receipts, but he refused to make such delivery. Appellee thereupon brought this action of trover in the circuit court of Cook county. The general issue was filed, and a trial by the court and jury resulted in a verdict in favor of appellee for $3134 against the bank, but the other defendants were found not guilty.

A motion for a new trial having been overruled, judgment was rendered on the verdict. The bank appealed to the Appellate Court, where the judgment was affirmed, and the case is brought to this court and errors are assigned on the record.

All questions of controverted fact having been found by the Appellate Court we can only consider questions of law arising thereon. Appellant claims that, conceding the facts

to be true, as found by the jury and the Appellate Court, still appellee is not entitled to recover, and the judgment should therefore be reversed.

It is contended by appellant that the action is misconceived; that a recovery can not be had in trover; that when the owner consents that his grain shall be commingled with other grain in such a manner as to lose its identity, he can not recover for its conversion. This would no doubt be true if a recovery should be sought by an action of replevin, not because the ownership of the property is changed, but because the sheriff could not deliver it to plaintiff.

To maintain trover it has never been held that the property must even be in existence, much less that it shall be capable of being identified and separated from all other property of the same character. No one surely will contend that merely by proving that the defendant had destroyed the property, or so changed it that its identity was lost, a recovery would be defeated. Whatever effect such proof might produce in replevin, it surely would be no defence to an action of trover.

Suppose two persons were, by consent, to mingle their grain, and one were to sell the entire quantity, could it be maintained that the other owner had no action to recover for the loss, or that trover would not lie against the seller or the buyer? It is perfectly apparent that he might maintain trover. By the intermixture neither would lose his legal title to the property, as that undeniably remained as it was before. The only change which that would produce is that of the difficulty of identity with a change of the rights as to possession.

If two persons were the joint owners of a specific chattel and one were to sell it and convert the proceeds to his own use, will it be contended that the other joint owner could not sue in trover and recover damages for the loss of his half? Trover being for the recovery of damages sustained by the plaintiff, for the conversion of his property, it can not matter whether he holds the property thus converted jointly with another or in severalty. His right of property in either case

is the same, and the damage he sustains is not different, and reason and justice require that the means of obtaining his rights should be the same in either case. Nor are we aware of any technical rule which prohibits it.

If, however, we refer to authority, it will be found to fully support these views. In Chitty on Pleading, p. 167, it is said the action lies against any person who had in his possession, by any means whatever, the personal property of another, and sold it or used it without the consent of the owner, or refused to deliver it when demanded. And it has been held that a person owning property mingled with that of another, may, on its conversion, maintain the action. See *Jackson* v. *Anderson,* 4 Taunt. 24; *Whitehouse* v. *Frost,* 12 East, 614. And in the cases of *Benjamin* v. *Stremple,* 13 Ill. 466, and *Boyle* v. *Levings,* 28 id. 314, it was held that one tenant in common of a chattel may maintain trover against the other tenant in common, where he has converted the property to his own use. This right was held to be given under the statute, but it only enlarges the common law right.

We are therefore of opinion that even if it can he said that appellee held a third interest in this grain in common with the other holders of receipts, that would be no impediment to his maintaining the action.

Nor does the case of *Bailey* v. *Bensley,* 87 Ill. 556, impinge this rule. In that case the questions involved were between the commission merchants and their consignor. He had shipped grain to them, to be sold when he should so order. When they sued him for a balance for advances, commissions, and charges paid for storage, one of the objections raised by him was that, on receiving receipts for grain he had consigned to them, with directions to hold it, they had sold and transferred the warehouse receipts given when his grain went into store, and that when he ordered them to make sales they furnished and sold other receipts representing the same quantity and grade of grain as he had stored, and for which the receipts had been given. But it was held that this being

according to usage on the board of trade, it was unobjectionable.

It was also said that "we do not see how, as appellant claims, the warehouse receipt can be regarded as the property, or as representing the property, of the consignor, on account of the receipt of whose grain it issued, so that the parting with such particular receipt is a disposal of the consignor's property. The grain, on being received at the warehouse, is stored in common bins, mixed with other grain, and loses its identity, and becomes incapable of specific designation,— that amount of grain is credited to the consignee. The warehouse receipt is given to the consignee as his voucher that he has in that warehouse, not the grain of the consignor, nor any particular grain, but a certain number of bushels of grain of the kind and grade mentioned in the receipt, subject to his order and disposal. The consignor is not named in the receipt. It does not represent his particular property. It is not issued to be used by him. For his protection and voucher he may be supposed to have a railroad receipt on shipment, and the acknowledgment of the consignee of the receipt of the grain."

Here, the court was not discussing what legal right the holder of the receipt has, but what claim the consignor has on his consignee, to whom the receipt was given, and which had never been delivered to the consignor, so as to vest title in him of any specific property or any number of bushels of the entire mass with which it was mingled. Had the consignee returned the receipt to the warehouseman and demanded a delivery of the grain, the latter could not have been heard to say the consignee was not the owner of that number of bushels of grain to be taken and separated from the great bulk of grain of the same grade. He would not have been entitled to the very same grain he stored or placed in the warehouse, but to other similar grain. So it would have been had the consignee given the receipt to the consignor, and he

had made the tender and demanded the grain for which the receipts called.

In that case it was also said that as two receipts for precisely the same amount and grade of grain were equivalent, it did not matter whether the consignee delivered the very same receipts he received when the grain went into the warehouse, or others for the same quantity, or quality and grade. On presenting either he would not have received the same he stored, as it would have been impossible to have delivered the very same grain that was received. So that, as between him and his consignor, he had no right to demand the identical receipt that was issued when his grain passed into the warehouse,—that any other receipt issued by the same warehouseman for a like number of bushels of the same grade would answer the same purpose, when the consignee wished to sell or withdraw the amount, as the original receipt. Either receipt invested him, when delivered to him, with the legal title to that amount of grain of the same grade, which he could undeniably have demanded, and, on paying the charges, if refused, maintain an action of trover and recover damages for its conversion.

It is true that this grain was delivered to Runyan and the demand was made of Stokes. But Runyan was compelled to sell the warehouse to pay indebtedness to the bank. He conveyed to Schaffner to hold in trust for the bank, and was compelled to deliver possession to the purchaser. And as he was not permitted to remove the grain he had received into the warehouse, except under circumstances not claimed to have existed, without committing a felony, he had no choice, but was compelled to surrender the possession of the grain with the elevator. Nor did Stokes, the bank or any other person acquire any title, claim or lien on the grain then in the warehouse, the possession of which was delivered with it. But they, by receiving it, became as mere substituted bailees in the place of Runyan, and became charged with the same duties to the owners, and were bound to deliver it precisely

as would Runyan had he been in possession. And this duty manifestly devolved on Stokes or the bank. A failure to deliver the grain, then, rendered one or the other liable to respond in damages.

It is insisted for the bank that its charter does not authorize it to engage in or carry on the business of warehousemen; that its charter only authorizes it to do a banking business, and the receipt, storage and otherwise handling grain as a warehouseman is *ultra vires*, and it can not be held liable. The jury by their verdict, and the Appellate Court by affirming the judgment of the circuit court, have found that the bank has converted this grain to its own use; that it has appropriated appellee's property and deprived him of it to the amount of the verdict, and that this was wrongfully done. And shall the bank be heard to say that, although it has appellee's property which it refuses to surrender to him, and has converted it to the use of the bank, and because it was obtained by the performance of acts not authorized by its charter, the bank will hold it and refuse to account for it or its proceeds? Such can not be the law. Suppose a person to make a special deposit in a bank of a sum of money, and the envelop should be broken, the money taken and placed with the funds of the bank and its profit account credited by the amount, and it should be paid out in the course of its business, could the bank, when sued, escape liability by saying that the bank is not authorized to receive special deposits for safe-keeping only, and the act was *ultra vires?* We presume no one would contend for such a defence. And it may be asked, in principle how does the case at bar differ from the one supposed? In such a case the bank would have received money and appropriated it, to which it had no claim, nor should it be permitted to hold it because it was wrongfully obtained.

The question is, not whether the bank was acting under and in conformity to the provisions of its charter in receiving and forwarding grain, but whether the bank has wrongfully converted appellee's property to its own use. If, as the jury

have found, the bank has, then it does not matter whether. the wrong was perpetrated whilst the bank was in the pursuit of its legitimate business or was acting against the provisions of its charter. The wrong to appellee is the same in the one case as in the other. It can be no defence to say the bank obtained and converted appellee's property contrary to the provisions of its charter. The wrong is the same, and it can not matter in what manner the wrong was perpetrated, as the liability is the same. It is the wrong, and not the manner in which it occurred, that we have to consider. It is not a defence for the bank to say we received and converted the grain and held the money without claim of right, but, as when we converted the property we were acting beyond the limits of our charter, you can not recover. ° The bank committed the wrong and is liable.

Perceiving no error in this record, the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*